UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT

 

No. 93-1823

 SALLY KLESSENS,

 Plaintiff, Appellant,

 v.

 UNITED STATES POSTAL SERVICE,

 Defendant, Appellee.

 

 ERRATA SHEET

 In response to the appellant's petition for rehearing in No.

93-1823, we delete the reference to Mark Persson on p.4, l.13 of

the opinion. The sentence as modified should read: "John

Russell denied the remarks attributed to him by plaintiff."

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS

 FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT

 

No. 93-1823

 SALLY KLESSENS,

 Plaintiff, Appellant,

 v.

 UNITED STATES POSTAL SERVICE,

 Defendant, Appellee.

 

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. F. T. Dupree, Jr.,* U.S. District Judge] 

 

 Before

 Selya, Circuit Judge, 

 Coffin, Senior Circuit Judge, 

 and Bownes, Senior Circuit Judge. 

 

 William J. Royal, Jr. for appellant. 

 Thomas E. Kanwit, Assistant United States Attorney, with 

whom Donald K. Stern, United States Attorney, was on brief for 

appellee.

 

 

 

*Of the Eastern District of North Carolina, sitting by

designation.

 BOWNES, Senior Circuit Judge. Plaintiff-appellant BOWNES, Senior Circuit Judge. 

Sally W. Klessens appeals from a judgment by the district

court denying her claims of sexual harassment and retaliatory

discharge brought pursuant to Title VII of the Civil Rights

Act of 1964, as amended, 42 U.S.C. 2000e-16, et seq. She 

initially attempted to raise a wrongful termination claim.

After defendant moved to dismiss for lack of subject matter

jurisdiction, the complaint was construed by the district

court as stating Title VII claims for sexual harassment and

retaliatory discharge.

 There are two main issues on appeal: (1) Whether

the district court applied the wrong legal standard in

finding that plaintiff was not subjected to a hostile and

abusive workplace environment and therefore erred in denying

plaintiff's sexual harassment claim; (2) Whether the

district court's finding that plaintiff's discharge was not

retaliatory was clearly erroneous.

 We have reviewed the record for clearly erroneous

findings of fact and erroneous rulings of law by the district

court. We find it appropriate to discuss each issue

separately.

 The Sexual Harassment Claim The Sexual Harassment Claim 

 Plaintiff's evidence can be summarized as follows.

She began work for the Postal Service on January 19, 1988, as

 -2- 2

a mail handler. Her immediate supervisor was John Russell.

A very short time after starting work, a coworker, William

Russell, not related to her supervisor, began making sexually

explicit remarks to her about her body. Russell persisted in

asking for a date despite the fact that his advances were

emphatically rebuffed. Russell made explicitly sexual

comments to plaintiff, one being, "If I don't get laid I'm

going to take hostages." Because of Russell's conduct

towards her, plaintiff made it a practice to eat her lunch in

her car. At least four times Russell joined her without an

invitation by plaintiff. She finally told him he was not

wanted and he stopped lunching with her.

 Other personnel, only one of whom (Mark Spillane)

plaintiff could name, also made sexually lewd statements to

her. The most frequent remark was "nice piece of ass." 

Spillane said to plaintiff that she had "small tits," and "go

fuck yourself." He also recounted to her at length his own

sexual exploits.

 Shortly after starting work, plaintiff complained

to her supervisor, John Russell, about William Russell's

conduct. According to plaintiff, John Russell showed no

sympathy and made jokes in the presence of her and William

Russell about "getting laid." These jokes were accompanied

by nudges to William Russell. John Russell also put his arm

 -3- 3

around plaintiff repeatedly. He claimed to view this in the

same way as shaking a person's hand. 

 Plaintiff then reported her harassment to John

Russell's supervisor, Mark Persson. According to plaintiff,

Persson did not say that he would do anything. Instead, he

told her, "OK, Bill [Russell] has done this before, he wrote

a letter to another female that worked there, saying that he

wanted to slip his tongue so far up her ass . . . ."

 Most of this evidence came from plaintiff's trial

testimony, and from the EEOC hearing transcript which was

admitted as evidence at the trial.

 There was evidence that tended to contradict and

undercut plaintiff's evidence. John Russell denied the

remarks attributed to them by plaintiff. According to the

defendant Postal Service, as soon as it became aware of

plaintiff's complaints about William Russell, it took steps

to investigate the problem. After the investigation, it

offered plaintiff a transfer that would take her away from

Russell. Plaintiff declined the transfer when it was

offered, but later in the summer of 1988, she agreed to a

transfer. The Postal Service also ultimately transferred

Russell to another post office.

 Prior to the transfers, Russell and plaintiff

regularly sat together in plaintiff's car during shift breaks

when the weather became warm in April or May of 1988.

 -4- 4

Plaintiff had coffee with Russell at least once after work.

On one occasion, she and Russell were together in her car for

several hours after work, having a discussion that extended

into the early hours of the morning. Defendant stresses that

no formal complaints about William Russell were made until

after plaintiff was ordered to undergo a fitness for duty

examination following her complaint about a workplace back

injury.

 Both sides agree that, until her back injury,

plaintiff performed her work in an exemplary fashion. This

was attested to in her evaluations by Mark Persson and John

Russell.

The District Court Opinion The District Court Opinion 

 The court purportedly followed the teachings of

Meritor Savings Bank v. Vinson, 477 U.S. 57 (1986), in 

deciding plaintiff's sexual harassment claim. It started

with the rule that sexual harassment of an employee which

creates a hostile working environment violates Title VII.

The court ruled that in order to prove a hostile environment

claim, a plaintiff must prove four things: (1) membership in

a protected class; (2) unwelcome sexual harassment; (3) the

harassment was based on sex; "and (4) the charged sexual

harassment had the effect of unreasonably interfering with

the plaintiff's work performance and creating an

 -5- 5

intimidating, hostile, or offensive working environment that

affected seriously the psychological well-being of the

plaintiff."

 The court found that plaintiff was unable to prove

the fourth element. Prefatory to its specific findings, the

court ruled that in order for sexual harassment to be

actionable under Title VII, the conduct had to be so severe

or pervasive as to alter the condition of the plaintiff's

employment and create an abusive working environment. It

further ruled: 

 Furthermore, a court must find both that
 a reasonable employee's psychological
 status and work performance would have
 been seriously undermined by the
 defendant's conduct and that the
 plaintiff was actually offended by the
 conduct as well as injured in some way by
 the hostile environment.

The court cited to Rabidue v. Osceola Refining Co., 805 F.2d 

611, 620 (6th Cir. 1986), for this proposition.

 The court found that plaintiff's proof failed to

meet the standard set forth. It found that the evidence

presented at trial "did not point to the sort of offensive or

abusive environment contemplated by the Supreme Court in

Meritor Savings Bank." The court was influenced by the fact 

that "not only was plaintiff able to do her job . . . but was

given positive performance evaluations during this period."

The court also pointed out that plaintiff let William Russell

sit with her in his car on several occasions and at least

 -6- 6

once she "conversed with him in her car after work." The

court found that this conduct, while not evidence that

plaintiff welcomed Russell's advances, "cast doubt on her

claim that she was subjected to an intolerable work

environment by his conduct." The court concluded that

"Russell's conduct -- while deplorable -- did not amount to a

hostile or offensive work environment within the meaning of

Title VII." The court noted that plaintiff testified that

she had never been fondled or touched in a sexual manner by

Russell or any other co-worker. In a footnote, the court

held that the remarks of Mark Spillane were "isolated" and

"also fail to show a hostile abusive work environment." 

 The court noted the conflict in testimony between

plaintiff and John Russell. It pointed out that Russell

acknowledged that off-color language was used occasionally in

the workplace, and testified that on one occasion plaintiff

stated to John Russell she would "cut [his] balls off and

nail them to the wall." The court found that it could not

say that plaintiff's testimony was more credible than that of

John Russell.

 The district court's opinion issued on April 23,

1993. As far as we can determine, it was not published. On

November 9, 1993, the Supreme Court decided Harris v. 

Forklift Systems, Inc., 114 S. Ct. 367 (1993). Certiorari 

was granted in Harris, 

 -7- 7

 to resolve a conflict among the Circuits
 on whether conduct, to be actionable as
 "abusive work environment" harassment (no
 quid pro quo harassment issue is present 
 here), must "seriously" affect [an
 employee's] psychological well-being" or
 lead the plaintiff to "suffe[r] injury."

 The Court noted that, in focusing on the employee's

psychological well-being, the district court was following

Rabidue v. Osceola Refining Co., 805 F.2d 611. Harris, 114 

S. Ct. at 370. The district court here also relied on

Rabidue in formulating its fourth element of proof. See 

supra at 6. 

 The Court held that the standard which it was

reaffirming

 takes a middle path between making
 actionable any conduct that is merely
 offensive and requiring the conduct to
 cause a tangible psychological injury.
 As we pointed out in Meritor, "mere 
 utterance of an ... epithet which
 engenders offensive feelings in a
 employee," ibid (internal quotation marks 
 omitted) does not sufficiently affect the
 conditions of employment to implicate
 Title VII. Conduct that is not severe or
 pervasive enough to create an objectively
 hostile or abusive work environment an 
 environment that a reasonable person
 would find hostile or abusive is beyond 
 Title VII's purview. Likewise, if the
 victim does not subjectively perceive the
 environment to be abusive, the conduct
 has not actually altered the conditions
 of the victim's employment, and there is
 no Title VII violation.

Id. at 370.  

 The Court went on:

 -8- 8

 But Title VII comes into play before
 the harassing conduct leads to a nervous
 breakdown. A discriminatorily abusive
 work environment, even one that does not
 seriously affect employees' psychological
 well-being, can and often will detract
 from employees' job performance,
 discourage employees from remaining on
 the job, or keep them from advancing in
 their careers. Moreover, even without
 regard to these tangible effects, the
 very fact that the discriminatory conduct
 was so severe or pervasive that it
 created a work environment abusive to
 employees because of their race, gender,
 religion, or national origin offends
 Title VII's broad rule of workplace
 equality. 

Id. at 370-71. 

 The Court further stated:

 We therefore believe the District
 Court erred in relying on whether the
 conduct "seriously affect[ed] plaintiff's
 psychological well-being" or led her to
 "suffe[r] injury." Such an inquiry may
 needlessly focus the factfinder's
 attention on concrete psychological harm,
 an element Title VII does not require.
 Certainly Title VII bars conduct that
 would seriously affect a reasonable
 person's psychological well-being, but
 the statute is not limited to such
 conduct. So long as the environment
 would reasonably be perceived, and is
 perceived, as hostile or abusive,
 Meritor, supra, 477 U.S., at 67, 106 
 S.Ct. at 2405, there is no need for it
 also to be psychologically injurious.

 The Court concluded by pointing out that,

 whether an environment is "hostile" or
 "abusive" can be determined only by
 looking at all the circumstances. These
 may include the frequency of the
 discriminatory conduct; its severity;
 whether it is physically threatening or

 -9- 9

 humiliating, or a mere offensive
 utterance; and whether it unreasonably
 interferes with an employee's work
 performance. The effect on the
 employee's psychological well-being is,
 of course, relevant to determining
 whether the plaintiff actually found the
 environment abusive. But while
 psychological harm, like any other
 relevant factor, may be taken into
 account, no single factor is required.

Id. at 371. 

 Harris prompted a motion by plaintiff for relief 

from judgment under Fed. R. Civ. P. 60(b). Plaintiff's

motion argued that the district court applied a different

standard than that mandated by Harris in determining whether 

plaintiff was subjected to an abusive work environment

arising from sexual harassment. The court, in reply to the

motion, stated that it had considered "all of the

circumstances," and that its decision was in line with

Harris. It held: 

 Correctly read, therefore, the court's
 memorandum of decision, far from being
 based solely on the lack of evidence
 showing plaintiff's severe psychological
 injury, was in fact based on a
 consideration of all the circumstances
 which led the court to conclude that
 plaintiff had failed to prove her claim
 of sexual harassment by a preponderance
 of the evidence as she was required to
 do. The court continues to adhere to
 that conclusion.

Although hindsight revamping of an opinion is unusual, it is

not without precedential support. See Aoude v. Mobil Oil 

Corp., 862 F.2d 890, 895 (1st Cir. 1988). 

 -10- 10

 The court, however, did not rely solely on its

reinterpretation of its own opinion in light of Harris to 

deny plaintiff's motion. It also stated another reason for

finding against the defendant on the issue of sexual

harassment. Because the court found it unnecessary to do so

in its original opinion, it specifically refrained from

deciding whether the Postal Service knew or should have known

of the alleged sexual harassment and failed to take prompt

action to stop it. There can be no doubt that this is one of

the elements of plaintiff's proof in a hostile environment

sexual harassment claim. See Lipsett v. University of Puerto 

Rico, 864 F.2d 881, 895-98 (1st Cir. 1988).  

 In its opinion denying plaintiff's motion for

relief from judgment, the court found 

 that as soon as the alleged sexual
 harassment was brought to the attention
 of defendant's management with authority
 to take corrective action the offending
 employee, William Russell, was promptly
 transferred to another of defendant's
 facilities.

 The sexual harassment issue is close, but the last

finding of the district court, which has a solid evidentiary

foundation, is insurmountable. It was not clearly erroneous.

We, therefore, affirm the district court on the sexual

harassment claim.

 The Retaliatory Discharge Claim The Retaliatory Discharge Claim 

 -11- 11

 Plaintiff claims she was discharged because of her

complaints of sexual harassment. Unlike the sexual

harassment claim, this is not a close issue. Plaintiff gave

false answers to certain questions asked on the forms she

filled out in applying for work with the Postal Service.

There was evidence from which it could reasonably be found

that plaintiff's sexual harassment claim was not implicated

in the Postal Service's decision to discharge plaintiff.

 Plaintiff was required to fill out a pre-employment

certificate of medical examination form (PS Form 2485) in

order to work for the Postal Service. Question number 4

asked, "Have you Ever Been Treated for Any Medical Condition

Other Than Minor Illness, or had Any Operations?" Plaintiff

answered "Yes" to this question and wrote in: "Tosilectomy

[sic] 1960." Question 20 on PS Form 2485 asked, "Do you Now

or Have you Ever Had Any of the Following Conditions,"

including Condition number 43, "Back Injury or Abnormality."

Plaintiff put a cross in the "No" column, as she did for all

of the other listed conditions.

 Plaintiff also had to answer questions on a form

entitled, "TEST OF STRENGTH AND STAMINA" (PS Form 2481).

Four questions were asked on this form: 

 1. DO YOU HAVE HEART TROUBLE?

 2. DO YOU HAVE A HERNIA OR RUPTURE?

 3. HAVE YOU HAD ANY TROUBLE WITH YOUR BACK?

 -12- 12

 4. IS THERE ANY OTHER REASON THAT YOU
 SHOULD NOT REPEATEDLY LIFT 70 POUNDS?

 Plaintiff answered "No" to all four questions.

 The evidence disclosed that plaintiff was in three

automobile accidents prior to going to work with the Postal

Service, and that each of the accidents caused injury to

plaintiff's back and neck. There was further evidence that

plaintiff suffered back pain in April and October of 1987,

and that she had thirteen weeks of physical therapy treatment

for her back during the two years before her employment by

the Postal Service. There also was evidence establishing

that plaintiff was fully aware of her back problems at the

time she filled out the two Postal Service forms.

 Plaintiff began working as a mail handler on

January 19, 1988. This required the regular and repeated

lifting of seventy pound mail bags. On July 31, 1988,

plaintiff requested that she be put on light duty work

because her back was bothering her. Several days later

plaintiff's supervisor learned that she claimed that her back

injury was caused by her work as a mail handler. He ordered

her to fill out an Injury on Duty (IOD) form immediately.

This form should have been completed and filed when plaintiff

first claimed she was injured at work. After the Postal

Service received the completed IOD form, it told plaintiff to

obtain clearance from her doctor that she could return to

work. Plaintiff submitted letters from her health care

 -13- 13

insurer, Harvard Community Health Plan, which disclosed a

pre-existing recurring back problem.

 Plaintiff was subsequently ordered to submit to a

fitness-for-duty examination. An examination was given

plaintiff by Dr. James Ryan on August 17, 1988. He concluded

that she had a pre-existing back problem which she had failed

to disclose on her Postal Service employment application

forms.

 Plaintiff was notified in September 1988 that she

would be terminated, effective October 1, 1988, for giving

false answers to questions on her employment application

forms. The termination action was initiated by her

supervisor in her new work location, Jeremiah Farren. Farren

testified that he was unaware of any sexual harassment

complaints by plaintiff when he decided to recommend her

termination. There also was evidence showing that the Postal

Service neither knew nor had any reason to know of

plaintiff's claims of sexual harassment by a Postal Service

employee other than William Russell prior to the time that

plaintiff was ordered to take a fitness-for-duty physical

examination. There was evidence establishing that other

postal employees had been discharged for giving false answers

to questions asked on Postal Service employment application

forms.

 -14- 14

 The district court applied the correct legal test

in its analysis of the retaliatory discharge claim. It found

that plaintiff had made out a prima facie case for

retaliatory discharge. After considering the facts in

detail, the court ultimately found that plaintiff had failed

to meet her burden of showing that the Postal Service's

stated reasons for her discharge were pretextual.

 We have considered carefully the evidence and

arguments of plaintiff, and do not find them sufficient to

overcome the clearly erroneous barrier. Plaintiff relies

heavily on the affidavit of Michaela Norton. Norton was

employed by the Postal Service as a physician's assistant

during the time plaintiff worked as a mail handler. Norton

interviewed plaintiff in connection with plaintiff's pre-

employment medical examination and assessment. Paragraphs

four and five of the Norton affidavit state:

 4. I am certain that if Ms.
 Klessens had indicated to me that she had
 ever experienced any recurrent back pain,
 any particular back injury or that she
 underwent physical therapy for her back,
 I would have made a notation of this on
 the PS Form 2485.

 5. Unless Ms. Klessens volunteered
 such information, I would have had no way
 of knowing of [sic] that she had a back
 condition or that she had back trouble
 previously. The only information she
 provided on the Form 2485 was that her
 back had been x-rayed after a motor
 vehicle accident. She told me, according
 to my notes, that the x-rays showed she
 had no problems. I therefore had no

 -15- 15

 reason to suspect any back injury or
 condition.

These statements reinforce defendant's assertion that

plaintiff knowingly withheld information during the

application process.

 Contrary to plaintiff's assertion, there was

evidence from which it could be reasonably found that the

Postal Service was not aware of plaintiff's back injury

history until Dr. Ryan's report. Plaintiff's basic

contention is that the district court clearly erred in

finding that she failed to prove the Postal Service's stated

reason for discharging her was pretextual.

 Our review of the record convinces us that this

finding was not clearly erroneous. Indeed, we think it

clearly correct.

 Affirmed. Affirmed. 

 -16- 16